

**SO ORDERED.**

**SIGNED this 6th day of February, 2013.**

Dale L. Somers
United States Bankruptcy Judge

Designated for on-line use but not for print publication

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF KANSAS

In Re:

GILBERT C. RANZ and
HELEN D. RANZ,

               DEBTORS.

DUGAN TRUCK LINE, LLC,

               PLAINTIFF,

v.

GILBERT C. RANZ  and
HELEN D. RANZ,

               DEFENDANTS.

CASE NO. 11-11691
CHAPTER 7

ADV. NO. 11-05190

## MEMORANDUM OPINION AND ORDER FOLLOWING TRIAL ON PLAINTIFF'S OBJECTION TO DEBTORS' DISCHARGE UNDER 11 U.S.C. § 523(a)(6)

Plaintiff Dugan Truck Lines (Dugan), Debtor Gilbert C. Ranz's former employer, seeks to exempt its claim for breach of fiduciary duty from discharge pursuant to 11 U.S.C. § 523(a)(6). Plaintiff further seeks judgment for the amount of its claim and attorneys' fees. The Court has jurisdiction.[1]

Trial was held on August 7, 2012. Plaintiff Dugan appeared by Molly M. Gordon of Depew Gillen Rathbun & McInteer LC. Debtors Gilbert C. Ranz (Gil Ranz) and Helen D. Ranz appeared by Todd Allison of the Law Off ice of Todd Allison, P.A. Debtor Gil Ranz also appeared in person. After the close of evidence and hearing the statements of counsel, the Court requested the parties to file proposed findings of fact and conclusions of law. Plaintiff did so, but Debtor did not. Having considered the testimony, the exhibits, the statements of counsel, and the case record, the Court is now ready to rule. For the reasons stated below, the Court finds that judgment should be entered against Debtor Gil Ranz excepting the claim of Dugan from discharge under § 523(a)(6) and that judgment should be entered in favor of Debtor Helen D. Ranz on the § 523(a)(6) complaint for lack of evidence of her involvement in the actions which gave rise to Dugan's claim. The Court finds the amount of the nondischargeable debt owed by Debtor Gil Ranz to Plaintiff Dugan is $1,539,381.55.

---

[1] This Court has jurisdiction over the parties and the subject matter pursuant to 28 U.S.C. §§ 157(a) and 1334(a) and (b), and the Standing Order of the United States District Court for the District of Kansas that exercised authority conferred by § 157(a) to refer to the District's bankruptcy judges all matters under the Bankruptcy Code and all proceedings arising under the Code or arising in or related to a case under the Code, effective July 10, 1984. This Court may hear and finally adjudicate this matter because it is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I). Furthermore, the Court has jurisdiction to award money damages in a 11 U.S.C. §523(a) proceeding. *Lang v. Lang (In re Lang)*, 293 B.R. 501, 516-17 (10th Cir. BAP. 2003).

**FINDINGS OF FACT.**

Dugan is a LTL (less than full load) regional carrier operating in Kansas, Missouri, Oklahoma, Texas, Arkansas, and Illinois. The company was founded in 2006 and is owned by members of the Dugan family. Glen Dugan, one of the owners, testified on behalf of Dugan. Debtor Gil Ranz was hired in September 2006 as general manager of Dugan. The role of manger is the top position at Dugan, which had approximately 80 employees. As general manager, Gil Ranz had access to Dugan's confidential information, and Dugan assumed that he would be loyal to the company as it conducted operations in a highly competitive business.

In the fall of 2009 and the spring of 2010, when the events which gave rise to this action occurred, Kratos Trucking, LLC (Kratos) was a direct competitor of Dugan owned by Kevin C. Busch (Busch). Turnpike Transit, Inc. (TTI) was a trucking company owned by Chris and Debbie Smith. The Smiths were interested in selling their business.

In 2009, at the suggestion of Gil Ranz, Dugan had attempted to purchase TTI. Dugan had prepared a document, which was reviewed by Gil Ranz, which conservatively estimated that the annual operational savings to Dugan from purchasing TTI to be $1,352,572.50.[2] Although the sale proposed in 2009 did not go through, Dugan continued to actively seek to purchase TTI. Dugan sent TTI a new letter of intent (LOI) dated December 1, 2009. It was signed on January 14, 2010.[3]

Unbeknownst to the owners of Dugan, starting in September 2009 several Dugan employees, principally Gil Ranz, were involved in a series of disloyal activities relating to the

---

[2] Exh. 23.

[3] Exh. 6.

3

ultimately successful acquisition of TTI by Kratos. At all times, the Dugan employees hid their activities on behalf of Kratos from Dugan. Concurrently, Gil Ranz was negotiating his purchase of an interest in Kratos.

Gil Ranz was actively involved in the purchase of TTI by Kratos. Kratos issued a LOI to TTI on October 9, 2009.[4] An exchange of e-mails between Gil Ranz and Busch on October 8, 2009 includes details of an anticipated requirement of TTI regarding personal guarantees and advises Gil Ranz of a scheduled conference call with Debbie and Mark Smith. Gil Ranz wrote that even though he wished to participate, he should not be on the call because he was known to the Smiths.[5] Glen Dugan testified that Gil Ranz had met the Smiths in conjunction with Dugan's attempted acquisition of TTI. Gil Ranz reviewed the TTI due diligence items sent to him by Busch.[6] A copy of the Kratos revised LOI dated November 24, 2009 was sent by Busch to Gil Ranz and one other Dugan employee, Richard Handsaker.[7]

Gil Ranz supplied insider information about Dugan to Busch. By e-mail dated December 9, 2009, Gil Ranz forwarded an equipment listing to Bush with the comment that it was "More Dugan news."[8] On the same day, Gil Ranz and Busch had telephone calls that lasted thirty-seven minutes, nineteen minutes, and fifteen minutes.[9]

---

[4] Exh. 5. It was revised on November 24, 2009.

[5] Exh. 2.

[6] Exh. 4.

[7] Exh. 5.

[8] Exh. 7.

[9] See Exh. 1.

4

After Dugan proposed a new LOI to TTI dated December 1, 2009, by e-mail dated December 15, 2009, Gil Ranz informed Busch that "Dugan was waiting for LOI" and that Chris Smith had called asking a third party assisting with the TTI sale to "dump our [Kratos] LOI and pursue the Dugan deal."[10] Gil Ranz admitted when testifying that the owners of Dugan would have been the source of the information sent to Busch. On December 15, 2009, after the information was sent to Busch, there were seven phone calls exchanged between Busch and Gil Ranz.[11]

On January 5, 2010, Busch e-mailed Gil Ranz and stated that he was in the process of amending the Kratos operating agreement to add Gil Ranz as a one-fifth owner of Kratos.[12] On behalf of Kratos Trucking, LLC, Gil Ranz filled out a financial services application dated January 5, 2010.[13]

On January 25, 2010, Gil Ranz and Busch exchanged messages about Dugan pricing, which was confidential information.[14] On that same date, there were eight phone calls placed between Gil Ranz and Busch.[15] Dugan discount tariffs, which are confidential, were given to Kratos.[16]

---

[10] Exh. 8.

[11] *See* Exh. 1.

[12] Exh. 13.

[13] Exh. 14.

[14] Exh. 16.

[15] See Exh. 1.

[16] The tariffs were found in a Kratos office on July 20, 2010, after the resignation of Gil Ranz.

5

Glen Dugan, an owner of Dugan, testified that Gil Ranz and the other disloyal employees undertook actions to harm the ongoing business of Dugan.  If Dugan failed, that would have meant more business for Kratos.  Gil Ranz was officed primarily in Springfield, Missouri.  Business was moved out of the Springfield terminal; drivers refused to pick up loads.  In March 2010 Busch wrote, "waiting and waiting . . . for DTL [Dugan Truck Line] to die!!!"[17]

By March 2010, Richard Handsaker (Dugan's director of sales) and Paul Scherer (Dugan's top salesman in the Kansas City market) had resigned from Dugan to go to work with Kratos.  In June 2010, after the purchase of TTI by Kratos, Gil Ranz resigned form Dugan.  Upon learning of and investigating details of Gil Ranz's and other's disloyal behavior, Dugan filed suit in Sedgwick County, Kansas District Court on September 15, 2010 against Kevin Busch, Kratos Trucking, LLC, Gilbert C. Ranz, Richard Handsaker, and Paul Sherer.  Dugan alleged that defendants Gil Ranz, Handsaker and Scherer engaged in a series of disloyal activities while employed at Dugan for the benefit of Busch and Kratos.

On June 8, 2011 , Gil Ranz, together with his wife, Helen D. Ranz, filed a voluntary petition under Chapter 7. On September 6, 2011, Dugan filed this adversary complaint objecting to the Ranzs' discharge of Dugan's claim under § 523(a)(6).  Meanwhile, the Sedgwick County court case proceeded against defendants other than Gil Ranz.  On March 9, 2012, the jury returned a verdict against Busch and Kratos in favor of Dugan for $1.45 million.

Busch testified by deposition since his attendance could not be compelled.  He fully corroborated that Gil Ranz sought to hide his activities from Dugan and that both Gil Ranz and Busch regarded the conduct as wrongful.  Busch testified that on December 9, 2009, Gil Ranz

---

[17] Exh. 18.

had told Busch that he (Ranz) had convinced Dugan to offer a much lower price for TTI that Gil

Ranz believed that TTI would accept.[18]  Busch also testified that in December and later Gil Ranz

told him about "his shenanigans with trying to derail and interfere with the deal."[19]  Busch

testified that Gil Ranz represented to him that Dugan "was going to bite the dust," but denied

knowing of specific actions of Gil Ranz to assure that Dugan did not survive until after Gil Ranz

left Dugan.  Busch also testified that Gil Ranz told him that even afer he left Dugan he had back

door access to Dugan's computer system and was manipulating Dugan's pricing.[20]

Gil Ranz testified briefly at trial.  He admitted to most of his conduct as stated above.  He

admitted that his actions were intentional.  He characterized his conduct as ill-advised and

reckless, but not malicious.  Although he acknowledged that Kratos' acquisition of TTI would

benefit him financially, Gil Ranz denied that when facilitating the sale of TTI to Kratos he

intended to harm Dugan.  In light of the evidence of Gil Ranz's actions, the Court finds the

denial not to be credible.  For example, Gil Ranz testified that until the state court litigation was

filed, he did not know that the efforts of Dugan and Kratos to buy TTI overlapped, even though

the record contains correspondence from him about promoting the Kratos offer over that of

Dugan.  He denied many aspects of Busch's testimony.  He denied that he had access to Dugan's

computer system after he left Dugan, but there is convincing evidence to the contrary.  He denied

his own attempts to keep his relationship with Busch from Dugan, saying that the concern was

that of Busch only, but the record contradicts this position.  He suggested that the 800 phone

---

[18] Exh. 27 at 55:23 - 60:10.

[19] *Id*. at 62:10-17.

[20] *Id*. at 102:10 - 103:12.

contacts between himself and Busch for the period September 15, 2009 through May 2010 as shown on the Dugan phone logs[21] could have been for the conduct of Dugan's business regarding warehousing and Kratos matters other than the acquisition on TTI. Debtor provided no evidence to corroborate this suggestion.

Glen Dugan testified as to the damages to Dugan caused by the disloyal acts of Gil Ranz. They are comprised of four elements. First, Dugan claims that Gil Ranz was the cause of Dugan's failure to purchase TTI and this resulted in damages of at least $1,352,572.50, the estimated savings to Dugan's operations which would have been realized during the first year if the purchase occurred.[22] Second, Dugan claims Gil Ranz damaged Dugan by instigating the resignation of two Dugan employees who became Kratos employees in March 2010. The damages claimed are for $117,666.01 in lost revenues for the period March 9, 2010, to June 20, 2010. The damages were calculated by comparing the productivity in 2009 with that in 2010.[23] Glen Dugan testified that other trucking companies were experiencing an increase in revenues in this period of 2010 as compared with 2009, but Dugan experienced a loss in the market where these employees worked. Third, Dugan seeks to recover $10,710.00 as revenues lost based upon Gil Ranz's use of stolen Dugan Tariffs after he left Dugan. Fourth, Dugan seeks to recover $58,433.04, the wages it paid Gil Ranz for the period September 2009, when Gil Ranz began promoting Krato's purchase of TTI, to June 2010, when he left Dugan's employment and went to

---

[21] Exh. 1.

[22] Exh. 23. The calculation of the projected losses is fully supported by the testimony of Glen Dugan. As noted above, the estimates were made when Dugan was attmepting to purchase ITT and were reviewed by Gil Ranz at that time.

[23] Exh. 29. The calculation of this element of damages is supported by the testimony of Glen Dugan.

work for Kratos. The calculation is based upon Dugan's employment records and does not include the cost of any benefits or expense reimbursements.[24] Gil Ranz did not challenge either Dugan's entitlement to these elements of damages or the specific amounts claimed.

There was no evidence that Debtor Helen D. Ranz was involved in the conduct which gave rise to Dugan's claim.

**DISCUSSION.**

Subsection 523(a)(6), the basis for Dugan's dischargeability claim, provides as follows:

> (a) A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt --
> . . .
>> (6) for willful and malicious injury by the debtor to another entity or to the property of another entity[.]

The Supreme Court has held that this subsection encompasses "only acts done with the actual intent to cause injury."[25] The fact that the word "willful"modifies the word "injury" indicates that "nondischargeability takes a deliberate or intentional *injury* not merely a deliberate or intentional *act* that leads to injury."[26] Without proof of both a willful act and malicious injury the objection to discharge fails.[27] Malicious "requires proof 'that the debtor either intend the resulting injury or intentionally take action that is substantially certain to cause the injury.'"[28] "Most courts have held that an injury inflicted intentionally and deliberately, and either with the intent to cause the harm complained of, or in circumstances in which the harm was certain or almost certain to result

---

[24] Exh. 28.

[25] *Kawaauhau v. Geiger*, 523 U.S. 57, 61 (1998).

[26] *Id.*

[27] *Panalis v. Moore (In re Moore)*, 357 F.3d 1125, 1129 (10th Cir. 2004).

[28] *Id., quoting Hope v. Walker (In re Walker)*, 48 F.3d 1161, 1164 (11th Cir. 1995).

9

from the debtor's act, constitutes willful and malicious conduct under section 523(a)(6)."[29]
Claims arising from intentional business torts have been excepted from discharge.[30]  A creditor
seeking to except a claim from discharge has a burden to prove by a preponderance of the
evidence that the debt is nondischargeable.[31]

Dugan's claim against Debtor Gil Ranz is based upon the tort of breach of fiduciary duty.
Gil Ranz was the general manager of Dugan, and in that capacity, he owed fiduciary duties to
Dugan.[32]  Those duties included acting with utmost good faith and loyalty for the furtherance and
advancement of Dugan's business.[33]  There is no doubt that Gil Ranz's intentional actions
constituted breaches of his fiduciary duties.  While general manager of Dugan, he secretly
assisted Kratos in the acquisition of TTI, while knowing that Dugan was also seeking to acquire
the company.  He provided confidential Dugan information to Busch for the benefit of Kratos.
He interfered with Dugan's employment of two salesmen, who left Dugan to work for Kratos.  He
placed his own interests above those of Dugan.

---

[29] 4 Collier on Bankruptcy ¶ 523.12[2] (Alan N. Resnick & Henry J.Sommer eds.-in-chief, 16th ed. rev. 2012).

[30] *E.g., Piccicuto v. Dwyer*, 39 F.3d 37 (1st Cir. 1994) (intentional interference with advantageous business relation and unfair trade practices); *Tusco Budget Outlet, Inc. v. Stutsman (In re Stutsman)*, 163 B.R. 374 (Bankr. N.D. Okla. 1993) (usurpation of corporate opportunities); *The Spring Works, Inc. v. Sarff* (*In re Sarff*), 242 B.R. 620 (6th Cir. BAP 2000) (debtor's obligation for compensatory and punitive damages for breach of duty of loyalty in providing assistance to competitor while he was still employed by plaintiff and for misappropriation of plaintiff's trade secrets excepted from discharge).

[31] *Grogan v. Garner*, 498 U.S. 279 (1991).

[32] *Monarch Transport, LLC v. FKMT, LLC*, 283 P.3d 249 (Table), 2012 WL 3629861, *10 (Kan. App. 2012), *citing Emprise Bank v. Rumisek*, 42 Kan. App.2d 498, Syl. ¶ 12, 215 P.3d 621 (2009).

[33] *Henderson v. Hassur*, 225 Kan. 678, 687, 594 P.2d 650, 658-59 (1979).

10

Dugan has a claim against Debtor Gil Ranz for compensation for the injuries caused by Gil Ranz's breach of fiduciary duty.[34] Dugan presented evidence that the losses sustained were: $1,352,572.50, the estimated savings to Dugan's operations which would have been realized during the year following the acquisition of TTI; $117,666.01, the estimated lost revenues for the period March 9, 2010, to June 20, 2010, based upon the resignation of two Dugan salesmen who were hired by Kratos; and $10,710.00, the estimated revenues lost based upon Gil Ranz's use for the benefit of Kratos of Dugan tariffs stolen afer he left Dugan. Further, "[a]n unfaithful servant forfeits that compensation he would otherwise have earned but for his unfaithfulness."[35] Dugan may therefore also recover $58,433.04, the wages it paid Gil Ranz for the period September 2009, when Gil Ranz began promoting Kratos' purchase of TTI, to June 2010, when he left Dugan's employment and went to work for Kratos. The total claim is therefore $1,539,381.55. Gil Ranz did not challenge his liability to Dugan for breach of fiduciary duty, the elements of damages, or the specific amounts claimed.

The Court finds that Debtor Gil Ranz acted willfully and maliciously when injuring Dugan and Dugan's claim is therefore excepted from discharge under § 523(a)(6). Gil Ranz admits that his conduct was intentional. Although he denies that he acted with intent to harm Dugan, the Court nevertheless finds his denial not to be credible and that his conduct was malicious. Harm to Dugan was certain or substantially certain to follow if Gil Ranz was successful in his efforts to have Kratos rather than Dugan acquire TTI. Gil Ranz was aware of the significant amount of the harm which would result, since he had reviewed Dugan's projections of

---

[34] *Ford v. Guarantee Abstract & Title Co., Inc.*, 220 Kan. 244, 261, 553 P.2d 254, 268 (1976).

[35] *Henderson v. Hassur*, 225 Kan. at 688, 594 P.2d at 659.

11

the savings it would realize from the acquisition. The benefit which Gil Ranz sought for himself as part owner of Kratos after its acquisition of TTI could occur only if Dugan were harmed. Gil Ranz's concealment from Dugan of his actions on behalf of Kratos and his acquisition of an interest in Kratos are circumstantial evidence that he was aware of the wrongfulness of his secret actions and the damage he was causing Dugan. While employed by Dugan as general manager, Gil Ranz provided Kratos with insider information and worked from inside of Dugan to weaken its operations. Gil Ranz facilitated the employment of two Dugan sales persons by Kratos. Even after leaving Dugan, Gil Ranz accessed Dugan's computer system and manipulated prices to the detriment of Dugan. The Court finds that harm to Dugan was substantially certain to result from Gil Ranz's breaches of his duty of loyalty and confidence arising from his position as general manger of Dugan.

**CONCLUSION**.

For the foregoing reasons, the Court determines that Dugan is entitled to judgment against Debtor Gil Ranz in the amount of $1,539,381.55 compensatory damages and that such judgment should be excepted from discharge under § 523(a)(6). Although Dugan also prayed for an award of attorneys fees, because it presented no evidence or arguments in support, the prayer should be denied. The complaint for judgment and nondischargeability against defendant Helen D. Ranz should be dismissed for lack of evidence.

The foregoing constitute Findings of Fact and Conclusions of Law under Rule 7052 of the Federal Rules of Bankruptcy Procedure which makes Rule 52(a) of the Federal Rules of Civil Procedure applicable to this proceeding. A judgment based upon this ruling will be entered on a

12

separate document as required by Federal Rule of Bankruptcy Procedure 7058 which makes

Federal Rule of Civil Procedure 58 applicable to this proceeding.

**IT IS SO ORDERED.**

### ###

13